J-S08011-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1292 MDA 2021 |

Appeal from the Decree Entered August 10, 2021
In the Court of Common Pleas of Northumberland County Orphans' Court
at No(s): ADOPTEE #48-2020

| | | |
|---|---|---|
| IN RE: J.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1294 MDA 2021 |

Appeal from the Decree Entered August 10, 2021
In the Court of Common Pleas of Northumberland County Orphans' Court
at No(s): ADOPTEE #49-2020

BEFORE: BOWES, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY BOWES, J.:                    **FILED APRIL 27, 2022**

J.R. ("Mother") appeals from the decrees entered on August 10, 2021, which terminated her parental rights to her daughters, J.C.M., born in June 2016, and J.M.R., born in January 2014.[1]  We affirm.

_____

[1] The orphans' court entered a separate decree terminating the rights of J.C.M.'s father, J.M. ("Father").  Father has filed an appeal at 1293 MDA 2021. *(Footnote Continued Next Page)*

Northumberland County Children and Youth Services ("CYS") was involved with Father on an unrelated matter with another child when Mother, J.C.M., and J.M.R. moved in with Father. At that time, CYS expanded its involvement to include Mother and her children. In January 2019, CYS attempted to administer drug tests to Mother and Father based on concerns with substance abuse. Mother tested positive for a controlled substance; Father refused the test. Ultimately, CYS took J.C.M. and J.M.R. into custody and placed them in kinship care.

Both children were adjudicated dependent based upon concerns with substance abuse, inadequate housing, lack of parenting abilities, and lack of employment. Mother and Father were ordered to undergo a drug and alcohol evaluation, comply with treatment recommendations, obtain stable housing and employment, visit with the children, and complete parenting classes.[2] Orphans' Court Opinion in Support of Final Decrees, 8/10/21, at unnumbered 1. Due to a lack of engagement with services and contact with the children, aggravated circumstances were found to exist against both parents in August 2019.

_____

The orphans' court also entered a separate decree terminating the rights of J.M.R.'s father. J.M.R.'s father is unknown and has not filed an appeal. As a note, we have added each child's middle initial for clarity within this memorandum because the children's first and last initials, as used in the caption, are identical to those of either Mother or Father.

[2] Since the certified record does not include the child permanency plans for J.C.M. and J.M.R., we glean the concerns at adjudication and the goals for reunification from the testimony presented at the termination hearings and the opinion of the orphans' court in support of the final decrees.

In February 2020, J.C.M. and J.M.R. changed kinship care and were placed with P.L. ("Maternal Grandmother"),[3] who resides in the state of Georgia. In June 2020, Mother and Father moved into a residence owned by Mother's father ("Maternal Grandfather") in Georgia. At that time, Mother began calling the children daily.[4]

In September 2020, CYS filed petitions to terminate the parental rights of Mother as to J.C.M. and J.M.R. pursuant to 23 Pa.C.S. § 2311(a)(1), (2), and (5), based on her failure to complete the respective child permanency plans.[5] Shortly before the petitions were filed, Mother completed a drug and alcohol evaluation through Georgia Hope and subsequently began the recommended treatment.[6] Mother attended two treatment sessions in October 2020.

A permanency review hearing was held in November 2020. Mother secured employment prior to the hearing, but subsequently quit that same

---

[3] The children have remained in this home since that time. Maternal Grandmother is a pre-adoptive resource for the children.

[4] Maternal Grandmother testified that Mother and Father both have daily phone calls with the children, but that J.M.R. is "not a big phone talker" and Mother "doesn't get on there a lot" so the calls are mainly between Father and J.C.M. N.T., 5/5/21, at 13; *see also id*. at 68 (Mother explaining that she tells her daughter she loves them but mostly lets Father and J.C.M. talk during the daily phone calls).

[5] CYS also filed petitions to terminate the parental rights of Father and J.M.R.'s unknown father.

[6] Father also began treatment at Georgia Hope at this time.

week. Following the hearing, the court found compelling circumstances existed not to terminate as Mother lived close enough to the children to establish a relationship and perform parental duties, CYS withdrew the petitions to terminate, and Mother began attending weekly in-person visits with J.C.M. and J.M.R., which were supervised by Maternal Grandmother.

Meanwhile, as part of Georgia Hope's treatment program, Mother was required to call in daily to determine whether it was her turn for a random drug test based upon a color-wheel system. However, she failed to make the daily calls and was not administered a single drug test between September 2020 and January 2021. Mother was discharged from Georgia Hope in January 2021 for non-attendance.

In January 2021, CYS sought and was granted the right to reinstate the petitions to terminate the parental rights of Mother and Father. The orphans' court held hearings on the petitions to terminate on April 8, 2021, and May 5, 2021.[7] CYS presented the testimony of several individuals from CYS, as well as a counselor from Georgia Hope and Maternal Grandmother. Maternal Grandmother testified that Mother and Father visited the children weekly and called daily. While the visits had gone well and the children were happy to see their parents, Maternal Grandmother did not believe Mother and Father

_____

[7] The court appointed Cindy Kerstetter, Esquire, as the guardian *ad litem* during the dependency proceedings. Attorney Kerstetter was appointed as legal counsel during the termination proceedings "after certifying on the record that there was no conflict between what was best for the girls and the girls' desired outcome." Orphans' Court Opinion in Support of Final Decrees, 8/10/21, at unnumbered 2 n.2.

were ready to care for the children as they did not have jobs or a car and had not been drug tested. She testified that if the parents' rights were terminated, she would permit them to remain part of the children's lives via visits, calls, and holiday celebrations.

Mother testified on her own behalf, as did Father. At the time of the hearing, Mother was incarcerated[8] and Father was residing in a hotel while he sought new housing. Regarding Mother's substance abuse issues, the counselor from Georgia Hope testified that Mother's case had been reopened on March 8, 2021. According to Mother, she underwent a new evaluation after her case was reopened, but still had not been drug tested. Finally, Attorney Kerstetter stated that the children loved their parents and, if allowed, would live with them.

Following the hearings, the orphans' court issued decrees terminating Mother's parental rights as to J.C.M. and J.M.R. pursuant to § 2511(a)(2), (5), (8), and (b). Mother filed timely notices of appeal and concise statements pursuant to Pa.R.A.P. 1925(a)(2). This Court consolidated the appeals *sua sponte*. The orphans' court did not file a Rule 1925(a) opinion or statement in lieu of opinion with this Court. Mother presents the following issues for our consideration:

---

[8] Mother was incarcerated on pending criminal charges. At the termination hearing, the court attempted to avoid any testimony pertaining to the conduct underlying the charges. Nonetheless, it appears that the charges related to a time where Mother, without permission, removed the children from the care of their initial kinship foster home based upon allegations of abuse. **See** N.T., 5/5/21, at 10, 19, 57, 65, 74.

I. Whether the trial court erred and/or abused its discretion in its determination that [CYS] presented clear and convincing evidence to terminate Mother's rights under 23 Pa.C.S.A. § 2511(a)(2), 2511(a)(5), and 2511(a)(8)[.]

II. Whether the trial court erred and/or abused its discretion in finding the termination of her parental rights would best serve the development, physical, and emotional needs and welfare of the children.

Mother's brief at 12 (cleaned up).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized [the appellate court's] deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (cleaned up). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under [§] 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (cleaned up).

Termination is proper when the moving party proves grounds for termination under any subsection of § 2511(a), as well as § 2511(b). *T.B.B.*, *supra* at 395. Mother asserts that CYS failed to establish by clear and convincing evidence the statutory grounds for termination of her parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). To affirm the termination of parental rights, we need only agree with the orphans' court as to any one subsection of § 2511(a), as well as § 2511(b). *See In re B.L.W.*,

843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).  We focus our analysis on § 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

First, we address whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to § 2511(a)(2).  Termination under this subsection requires that the moving party prove the following elements:  "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes

- 8 -

of the incapacity, abuse, neglect or refusal cannot or will not be remedied."

*In re C.M.K.*, 203 A.3d 258, 262 (Pa.Super. 2019) (citation omitted). Termination is not limited to affirmative misconduct but may be based upon parental capacity that cannot be remedied. *Id*. (citation omitted). Finally, "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id*. (citation omitted).

Mother argues that the orphans' court abused its discretion in granting termination because she "had secured stable housing in Georgia" and was "participating with Georgia Hope." Mother's brief at 17.[9] Mother highlights her positive visits with J.C.M. and J.M.R. *Id*. Additionally, she refutes CYS's contention that she is addicted to a controlled substance and claims that she "is willing to be drug tested." *Id*. at 18. At the termination hearing, Mother testified that she was willing to comply with the ordered services but did not do so because CYS did not set them up, and that her initial discharge from Georgia Hope was due to a misunderstanding about scheduling with a new counselor. N.T., 5/5/21, at 76-80.

The orphans' court acknowledged that Mother has had regular contact and visits with the children but nonetheless concluded that she has "failed to remedy the circumstances which led to placement." Orphans' Court Opinion

_____

[9] We note with displeasure that Mother's counsel, who also represents Father in his separate appeal, appears to have re-used portions of Father's brief herein. *See* Mother's brief at 15, 17, 19 (using male pronouns for Mother and referencing a single child instead of J.C.M. and J.M.R.); *see also id*. at 1 (basing this Court's jurisdiction on the right to appeal from a judgment of sentence).

in Support of Final Decrees, 8/10/21, at unnumbered 4. Specifically, Mother has "avoided services meant to better [her] parenting and functioning[,]" her "substance abuse concerns remain[,]" she has not "maintained employment[,]" and she has "not taken advantage of the services offered by" CYS. *Id*.

The assessment of the orphans' court is supported by the certified record. At the time of the termination hearing, J.C.M. and J.M.R. had been in care for over two years based upon substance abuse concerns and the lack of adequate housing, parenting abilities, and employment. Mother was aware of the child permanency plans and, more specifically, her need to address her substance abuse issues. N.T., 4/8/21, at 31, 33 (ordered to complete drug testing, drug and alcohol counseling, and parenting). However, during that period, Mother failed to remedy the underlying concerns.

With respect to the primary concern, Mother's substance abuse, Mother did not undergo a drug and alcohol evaluation until September 2020, which was nineteen months after J.C.M. and J.M.R. were placed in kinship care. *Id*. at 5, 38, 45, 51. Despite being recommended for treatment, Mother only attended two sessions, failed to comply with the color-wheel system for calling to be drug tested, and was discharged for non-attendance. *Id*. at 5-7, 10-11.

Coincidentally, it was not until after CYS requested reinstatement of the petitions to terminate Mother's parental rights that she sought to reopen her treatment program with Georgia Hope. *Id*. at 69 (after being advised that CYS intended to seek reinstatement of the termination petitions, Mother and

Father told their CYS caseworker, Kim Carpenter, that they "want[ed] to start services again to comply with the [c]ourt-ordered services and the child permanency plans"). As of the second termination hearing, Mother had undergone a new evaluation but still had not been drug tested.[10] *Id*. at 5-9; N.T., 5/5/21, at 86-87. While Mother argues she is willing to be drug tested, the certified record bears out that she has generally avoided drug testing since J.C.M. and J.M.R. were placed in kinship care. *See* N.T., 4/8/21, at 6, 10, 70 (unable to remember to call into Georgia Hope's color-wheel system every day during initial enrollment), *id*. at 29-30 (unable to provide urine sample following adjudication hearing in February 2019); *id*. at 36-37 (unable to provide sufficient urine sample for analysis in May 2019).

As to the other concerns, Mother was discharged from court-ordered parenting classes in June 2019 for non-attendance. *Id*. at 71. Rebecca Horst, one of the CYS resource workers assigned to the case, testified that Mother failed to complete the parenting, budgeting, and community resource services offered by CYS. *Id*. at 56, 62. Aside from approximately one week around the November 2020 permanency review hearing, Mother has not been employed. *Id*. at 70; N.T., 5/5/21, at 83, 86. As to stable housing, Mother and Father had been living in a residence provided by Maternal Grandfather

_____

[10] Mother's testimony was unclear as to whether she had completed any treatment sessions following her new evaluation. *Compare* N.T., 5/5/21, at 70 (stating she did not have her initial appointment because she was incarcerated prior to it being scheduled); *with id*. at 86-87 (stating that overall, she has attended two evaluations and three counseling sessions with Georgia Hope).

in Georgia beginning in June 2020. N.T., 4/8/21, at 76. However, at the time of the second termination hearing Mother was incarcerated on pending charges and Father was residing in a hotel while looking for an apartment because Maternal Grandfather had asked him to leave the residence. N.T., 5/5/21, at 8-9, 19, 24, 45.

Stated simply, Mother has failed to substantially comply with her court-ordered goals or remedy the causes leading to her incapacity. While it is commendable that Mother is again attempting to receive treatment,

> the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Accordingly, the orphans' court did not abuse its discretion in finding statutory support for termination pursuant to § 2511(a)(2).

We now turn to § 2511(b). This Court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*,

> 946 A.2d 753, 762-63 (Pa.Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010).

Mother argues that termination is against the best interests of her children. Mother's brief at 19. She assails the decision of the orphans' court not to order a bonding assessment. *Id*. According to Mother, prior to her incarceration she had begun treatment at Georgia Hope as CYS wished and, following her release, plans to return to Georgia and obtain appropriate housing. *Id*. at 19-20.

As a general matter, Pennsylvania does not require the orphans' court to enlist a formal bonding evaluation or base its needs and welfare analysis upon expert testimony. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2011). "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, *supra*, at 268. In weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*. A court cannot "toll the well-being and permanency" of a child indefinitely in the hope that a parent "will summon

the ability to handle the responsibilities of parenting." ***In re C.L.G.***, 956 A.2d

999, 1007 (Pa.Super. 2008) (*en banc*) (citation omitted).

> In relation to § 2511(b), the orphans' court provided as follows:

> [The orphans' c]ourt finds credible the testimony of the caseworkers, resource worker, and Maternal Grandmother that the children see maternal grandparents as their primary caretakers. The parents are not "parental" figures for the children. The children are both young and need permanence. Th[e orphans' c]ourt is also mindful of the fact that because the [m]aternal [g]randparents are the adoptive resource, it is unlikely that the parents will ever be shut out of their children's lives. It was testified to extensively that the parents visit "whenever they want" and they do have a bond with their children. Because legally terminating their parental rights will not change the actual relationship the parents have with their children, the effect of severing that bond in a termination is minimal.

Orphans' Court Opinion in Support of Final Decrees, 8/10/21, at unnumbered 4-5.

This assessment is supported by the certified record. At the termination hearing, it was evident that a bond exists between Mother and J.C.M. and J.M.R., the children love her, and she has had regular and appropriate in-person contact with them since November 2020. However, we find the orphans' court's description of the visits as "akin to 'playdates' as opposed to parental interactions" accurate. Orphans' Court Opinion in Support of Final Decrees, 8/10/21, at unnumbered 4. For example, Maternal Grandmother generally chooses the locations for the visits and provides activities or crafts for the family. N.T., 5/5/21, at 5-7. Mother and Father usually provide food for the children during the weekly visits, but sometimes are not able to afford food and Maternal Grandmother will cover that expense when necessary. ***Id***.

at 5-6. Finally, despite Mother, Father, J.C.M., and J.M.R. all being physically together during visits, they generally do not spend time together as a family. Instead, Mother typically visits solely with J.M.R. while Father spends time with J.C.M. N.T., 4/8/21, at 72; N.T. 5/5/21, at 8.

Significantly, it is Maternal Grandmother who provides the parental care for J.C.M. and J.M.R., as well as the intangibles such as "love, comfort, security, and stability[.]" ***J.M.***, ***supra*** at 324. Ms. Carpenter testified that since living with Maternal Grandmother, J.C.M. and J.M.R. have been brought up to date on their vaccinations and received significant dental work due to a lack of prior dental care. N.T., 4/8/21, at 78. Maternal Grandmother further testified that the children have been in therapy, participated in extracurricular activities, are doing very well in school, and have been thriving in every way possible since living with her. N.T., 5/5/21, at 4.

At the time of the hearings, J.C.M. and J.M.R. expressed, through their counsel, that they loved Mother and would live with her if possible. N.T., 5/5/21, at 96. While the children still express this abstract wish in their brief to this Court, they acknowledge the reality that Mother has not addressed the issues that led to placement in the first place. Moreover, they have settled into a regular routine with Maternal Grandmother over the past two years and have flourished at school. As such, they now desire to remain living with Maternal Grandmother. ***See*** J.C.M. and J.M.R.'s brief at 2-4.

Critically, Maternal Grandmother testified at the termination hearing that little would change in terms of Mother's contact with the children if her

parental rights were terminated. Specifically, while acknowledging that daily phone calls might not continue, Maternal Grandmother envisioned that Mother would still visit with the children, call them, and partake in holiday celebrations. N.T., 5/5/21, at 15-16.

The certified record demonstrates that J.C.M. and J.M.R. are best served by terminating the parental rights of Mother in anticipation of an adoption by Maternal Grandmother. Stated plainly, J.C.M. and J.M.R. have thrived since being in Maternal Grandmother's care, as she has provided a stable, loving environment that consistently satisfied their developmental, physical, and emotional needs and welfare. Moreover, the record is clear that while a parental bond will legally be severed, Mother will remain part of the children's lives even after termination. As such, the record supports the assessment of the orphans' court that the effect of legally severing the parental bond between Mother and J.C.M. and J.M.R. will not result have detrimental effects on either child.

Based on the foregoing, we affirm the decrees of the orphans' court terminating Mother's parental rights as to J.C.M. and J.M.R.

Decrees affirmed.

Judge McCaffery joins this Memorandum.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/27/2022